# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 2007 Session

## STATE OF TENNESSEE v. BRANDON MOBLEY

**Direct Appeal from the Criminal Court for Knox County**
**No. 78699     Ray L. Jenkins, Judge**

---

**No. E2006-00469-CCA-R3-CD - Filed June 11, 2007**

---

The Defendant, Brandon Mobley, was convicted by a Knox County jury of two counts of first degree murder, especially aggravated robbery, and setting fire to personal property, and the trial court sentenced him to two consecutive life sentences plus twenty-two years.  On appeal, he alleges: (1) there is insufficient evidence upon which to convict him on either count of first-degree murder; (2) there is insufficient evidence upon which to convict him of especially aggravated robbery; (3) the trial court erred in initially prohibiting testimony from a defense expert, which caused a violation of his Fifth Amendment rights; and (4) the trial court erred in sentencing him.  After reviewing the record and applicable law, we affirm the Defendant's convictions, but we conclude the Defendant was improperly sentenced.  Thus, we modify the Defendant's sentences for his convictions for especially aggravated robbery and setting fire to personal property from twenty to eighteen years and from two years to one year, respectively.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed As Modified**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J.C. MCLIN, JJ., joined.

Brandt W. Davis (at trial), Knoxville, Tennessee, and Julie A. Rice (on appeal), Knoxville, Tennessee, for the Appellant, Brandon Mobley.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; Takisha Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I.  Facts

The facts making up the basis for the Defendant's convictions as presented at trial are as follows: Tiffany Nance, the sister of one of the victims, Joshua Nance, testified that her brother and

Oshalique Hoffman, the other victim, were dating. Hoffman drove a blue Buick with special chrome rims at the time she was killed on May 26, 2003, Memorial Day. That day, Tiffany Nance was sitting on the porch of her grandmother's house with Nance and Hoffman when Nance received a phone call. Nance stated he had to go out, but he would be back in about thirty minutes. Shortly after Nance and Hoffman left in Hoffman's car, Tiffany Nance received a call, during which she learned that Hoffman was found dead in an area known as Western Heights, and Nance was not found there. She and her mother went to where Hoffman was found, and then left the scene to look for Nance. They searched for hours until they were informed that Nance's body had been found around 5:00 a.m. the next morning.

Jamesena Thompson testified she knew both Hoffman and the Defendant. Hoffman's child played with Thompson's grandchild on occasion, and the Defendant lived across the street from Thompson. Thompson described Hoffman's car as a beige, dark brown, two-toned car with special rims. She stated that Hoffman was very particular about her car, and she did not let others drive it. On Memorial Day, Thompson was at her daughter's house when she heard tires squealing. She turned and saw the Defendant driving Hoffman's car, and she immediately thought he had stolen it because of Hoffman's attitude towards her car. She called Hoffman's mother to report what she saw, and she ran to where the car came from. She found Hoffman lying dead on the ground with a pistol beside her.

On cross-examination, Thompson testified that she did not hear any gunshots. What caught her attention was the Defendant squealing the tires. She watched the Defendant run two stop signs, but other than that he did not appear to be driving out of control. When the Defendant drove by, he nodded to Thompson and then appeared to be leaning over adjusting the music. Thompson believed the apartments around the location where she found Hoffman were occupied at the time of the shootings.

Officer Ed Johnson testified that he was working on Memorial Day, 2003, when he was called to the scene of a shooting. When he arrived, he found Hoffman lying on the ground with a handgun beside her. He took photographs and videotaped the scene. Officer Johnson identified the pistol he found and stated it was recovered with two spent cartridges and four unspent cartridges. A fingerprint and blood were found on the gun, and they were sent to the lab for analysis. Later, at the forensic center, Hoffman's body was checked for residue that would have indicated how close the gun was to her when it was fired. Those swabs were also sent for analysis. Officer Johnson was then called to the scene of a burned vehicle, which he photographed. Officer Johnson then testified he was called to a residence on Henry Haynes. There, he found bloody towels, a Swisher Sweets Blunt box, a bloody ball cap, a bloody tee shirt, car floor mats, and cleaning supplies. Some of the things were found in a cardboard box, some in garbage bags. The evidence was then taken for analysis.

On cross-examination, Officer Johnson testified that the evidence he recovered at the Henry Haynes residence was on a deck when he arrived. The majority of it was sitting in tied up trash-bags. The gunshot residue tests that were performed on Hoffman's body came back somewhat

inconclusive. There was no gunshot residue, but Officer Johnson stated that did not necessarily mean Hoffman did not handle, fire, or was not near the gun when it was fired.

Tabith Robinson testified that she is the sister of Jada Byrge, the Defendant's ex-girlfriend. On Memorial Day, 2003, the Defendant came to her house and asked for a bowl of water and some towels, stating he had just been in a car accident. After being given the towels, the Defendant asked Robinson for a phone and a phonebook so that he could call Po-Boys Tires. The Defendant called Po-Boys Tires, a store that buys and sells rims, but it was closed. Next, Robinson began helping the Defendant clean his car until she noticed something on the dashboard. She went inside to tell her mother what she saw, and Robinson's mother came outside, saw what was on the dashboard, and said, "Don't you think you need to get them [sic] brains off the dashboard." The Defendant responded that it was spit. Then, the Defendant's friends drove up in a green Jeep, and they all left. The Defendant left the towels, bowl, and the scrub brush in the front yard.

On cross-examination, Robinson testified that she did not actually hear the Defendant call Po-Boys tires; however, he asked for the phonebook to look-up the number for the tire store. On re-direct examination, Robinson stated that the Defendant had a "wad" of money on him. On re-cross examination, Robinson stated she saw this money when the Defendant was on the phone, on her front porch, counting the money.

Jada Byrge testified she had known the Defendant since he was fourteen, and they had dated for about three months prior to the events on Memorial Day, 2003. Byrge stated that she knew the Defendant to carry a gun, and she recalled that he purchased one from a man living behind her about two weeks prior to the shootings. At one point, the Defendant shot the gun while at Byrge's house on the back deck. Early in the morning on Memorial Day, Byrge and the Defendant broke up, but later that day Byrge received a call from the Defendant asking to come by her house. She told him he could not come by "because of what he had [done]." The Defendant responded he did not do anything and seemed as though nothing bothered him.

On cross-examination, Byrge testified that the Defendant called her between twelve and one in the afternoon asking to come by. The day that the gun was fired on her back deck, she, the Defendant, and a friend named Valerie all fired the gun, and the shell casings were emptied onto the deck when they were finished. On re-direct examination, Byrge clarified that when she talked to the Defendant on the phone, she already knew about the two deaths, and that was what she was referring to when she said, "You know what you did." Byrge also stated she had seen the Defendant wear a pair of white shoes that had been entered into evidence.

Robert Dean Wilson, Jr., testified that, on Memorial Day in 2003, he had known the Defendant for three to four months, and the two had met through Wilson's cousin, Brandon Walden. While Wilson was at home that day, he called Walden to come pick him up, as they frequently rode around together in his green Jeep Cherokee. Walden arrived with another friend, Lance Scarbrough, and Wilson joined them. While riding around, they got a call from the Defendant, who asked them to pick him up at Byrge's house. Once they arrived at Byrge's house, the Defendant told them he

had stolen a car, and he wanted them to follow him. Wilson and Walden followed the Defendant until he pulled into a gravel road. Wilson stated he could not see the Defendant, but after a few minutes the Defendant came to the Jeep and got in. Wilson noticed blood spots on the Defendant's clothing and shoes but did not say anything about it. The Defendant then asked Walden to take him to Lovell Road so he could get a motel room. The Defendant then used Walden's phone to call the the mother of his child. Wilson noticed a sum of money on the Defendant, appearing to be about $1500.

Wilson further testified that the Defendant described to the group what had happened, stating that he planned on getting dope from the two victims, but Nance told him that if the Defendant did not "pay up" the money he owed, his mother could pick him up at the morgue. Nance laid a gun on his lap, so the Defendant reacted and shot both victims. The Defendant told the group he would "rather have twelve judging him than six carrying him." After he shot the two, he pushed Hoffman out of the car and dumped Nance's body behind a church. Wilson stated that the Defendant always carried a gun with him, and when they got to the motel the Defendant removed his shoes and threw them into a garbage can. The Defendant then made a number of phone calls.

On cross-examination, Wilson stated that he, Walden, Scarbrough, and the Defendant were initially the only ones in the motel room. When they left, only the Defendant and his girlfriend remained. Wilson stated that he had never been to Byrge's house, and he did not test fire the gun. He stated that he saw the Defendant counting the money while sitting in the back of the Jeep, and it appeared to be mostly twenty dollar bills. The group was only at Byrge's house for a couple of minutes before they left, following the Defendant. All three of the men stayed in the Jeep while the Defendant pulled onto the gravel driveway, out of sight. Wilson did not know Nance, but the Defendant stated that he was buying drugs from him. The Defendant regularly carried what appeared to be a .38 revolver on his hip, out in the open. When the group was in the motel room, Wilson saw the Defendant take off his shoes and tie them up in a motel trash bag. When Wilson left, the shoes were sitting in the bag in the room.

Officer Ryan Flores testified that he was working the night shift on the morning after Memorial Day, when he was instructed to look for a body behind a church. Behind the third church they checked, he and his partner found Nance's body. On cross-examination, Officer Flores stated that the body was found at 4:00 a.m. on May 27, 2003.

Officer Daniel Crenshaw testified that he worked for the Knoxville Police Department, and he responded to the church behind which Nance's body was located. When he found the body, he noticed a gunshot wound to the head, the victim's shirt was pulled up towards the top of his abdomen, and there was maggot activity in the eyes, nose, and mouth. Officer Crenshaw determined that the fingerprints on the revolver found near Hoffman's body were those of the Defendant.

Patrica Ann Resig testified that she worked for the Knoxville Police Department examining firearms. Resig testified that the two bullets entered into evidence were fired from the revolver found beside Hoffman. Resig also stated that a spent shell casing found from Byrge's house was

fired from the revolver.

Dennis Harms testified that he worked at the Knight's Inn. He stated that he took a reservation from a customer named Eileen Lombardi on May 26, Memorial Day, at 4:10 p.m. She reserved the room for three days, but, after she checked-in, Harms never saw her again. However, two other people entered the room, a tall slim black man and a short stocky black woman. Harms noticed the switchboard frequently lighting up, indicating a number of phone calls being made from the room. Then, the woman came to the front desk requesting a plunger because the toilet was stopped up; she returned the plunger a short time later. Harms then noticed a few cars driving around the parking lot aimlessly, so he inquired as to the occupants' business there. They stated they were with the Sheriff's Department, so Harms went back to the front desk. A short time later, the officers came in and asked Harms if he had seen a person in a picture they showed him. Harms replied he had not, but he went to the room under the auspices of checking on the toilet to find out if the individual was in the room, which he was. Then, Harms saw a car make a circle in the parking lot, back up to the room, and the occupants ran out into the waiting car. The officers stopped the car and the Defendant was arrested.

Jennifer Milsaps, of the Tennessee Bureau of Investigation ("TBI"), testified that she analyzed the tee-shirt, towels, and the ball cap provided to her by the Knoxville Police Department. The blood on the tee-shirt was Hoffman's, while the towels and ball cap contained Nance's blood.

Kelvin Woodby, of the TBI, testified that he tested swabs from the revolver and found Hoffman's blood present. Additionally, Hoffman's blood was found on the tennis shoes.

Dr. Sandra Elkins, the Knox County Medical Examiner, testified that she performed an autopsy on Hoffman and determined that the cause of death was a gunshot to the head. Dr. Elkins agreed that the path of the bullet was consistent with one firing from the backseat of a car while Hoffman was sitting in the driver's seat. Dr. Elkins also performed an autopsy on Nance and determined that he also died from a gunshot to the head. Dr. Elkins stated that the gun was less than six inches from Nance's head when it was fired. She also agreed that the nature of the angles was consistent with someone sitting in the back seat of a car and shooting Nance while he sat in the front passenger seat. Nance appeared not to have died instantly, instead living up to four hours after he was shot. Had he received medical care, his chances of survival would have increased, but Dr. Elkins could not say for certain that he would have survived.

On cross-examination, Dr. Elkins testified that the gunshot immediately rendered Nance unconscious, and, although it is possible Nance could have survived with prompt medical treatment, he probably would not have survived. Hoffman was shot from greater than twenty-four inches away, and the bullet hit her brain stem, causing almost instantaneous death. Due to the nature of the maggots on Nance, Dr. Elkins stated that he was not in the field more than twenty-four hours.

The Defendant called Investigator Ken Slagle who testified that his report stated that he received a call from a man who claimed to live on a farm next to where the car was found burning.

Nance's phone was found by the car, and the last number dialed on the phone was that of the Defendant's mother's residence. Additionally, the license plate was registered to a Mazda that belonged to Michael Northwitt of Maryville. Although there was no indication on the title that Hoffman owned the car, there was a letter from someone claiming that they had sold the car to Hoffman. Investigator Slagle then stated that "quail cars" usually do not have the proper tags because they are used to transport crack cocaine.

On cross-examination, Investigator Slagle testified that the police followed the chain of title to someone who claimed she sold the car to Hoffman. Investigator Slagle further testified that the apartments in the area were vacant, and it would be an ideal spot to go undetected. Additionally, the phone call made to the Defendant's mother occurred at 1:41 p.m., but the shooting took place around 1:25 or 1:30 p.m. A number of other phone calls were made around that time, also. On re-cross examination, Investigator Slagle stated that he arrived on the scene minutes after the shooting, and there were already a number of people around. Further, the parking lot where the shooting took place was approximately one hundred yards from the street.

After Investigator Slagle testified, the Defendant sought to call Dr. Pam Auble to testify on his behalf. She was prepared to offer her opinion that, due to the Defendant's mental illnesses, he would have been unable to premeditate at the time of the killings. The State objected, arguing this testimony would invade the province of the jury. Alternatively, the State asserted that because there was no defense of insanity offered the testimony would be immaterial and irrelevant. The Defendant responded that the law entitles a defendant to have a qualified expert testify about a mental condition. The State responded that this was a diminished capacity argument, which is not allowed in Tennessee. After some discussion of the issue, the trial court found the testimony offered would be "invasive and not allowable." Subsequently, the Defendant took the stand.

The Defendant testified that, in 2003, he was not working except for selling drugs. He bought his drugs from one of the victims, Nance, and he would sell them in the Western Heights area. The Defendant stated that the night before Memorial Day, 2003, he was with a number of people at his mother's house when he received a call from Nance asking the Defendant to pay Nance the money he owed to him. The Defendant had been in debt to Nance for $2000 for about two weeks. Nance threatened him, stating that he might be forced to come to the Defendant's house, which the Defendant did not want. Nance insisted that the Defendant meet him. The Defendant had seen Nance carry a gun before, so he complied. On his way out, he grabbed the gun he was in the habit of carrying since he had been robbed some three weeks earlier. The Defendant walked down the block to the meeting place and waited about five minutes before Nance and Hoffman drove up. The Defendant stated he did not want to get in the car and that he only wanted to give the cocaine back to Nance that Nance had "fronted" to him. Nance insisted the Defendant get in the back seat of the car and shut the door, which the Defendant did.

The Defendant told Nance that he wished to return the drugs and the little money he had made from selling them and call it even. However, Nance insisted that the money was what he wanted, and if the Defendant did not have it there would be problems. Nance told him that if he did

not come up with the $2000, his mother would be identifying him at the morgue. Nance showed him the gun he was carrying, and the Defendant reacted by shooting Nance. He saw Hoffman duck, and he did not know if she was reaching for a weapon, so the Defendant shot her too. Then, the Defendant panicked and laid Hoffman's body on the parking lot. The Defendant got into the driver's seat and drove away from the scene, eventually ending up at Byrge's house.

On cross-examination, the Defendant admitted that phone records showed that someone called Nance from the Defendant's mother's cell phone a number of times between 12:37 p.m. and 12:43 p.m. on Memorial Day. However, the Defendant stated he did not recall making those phone calls, and it was most likely his mother's boyfriend, who bought drugs from Nance. Finally, at 1:20 p.m., Nance called the Defendant's mother's phone, but the Defendant denied receiving that call. The Defendant described again in detail the sequence of the shooting, and he stated that one ounce of cocaine would cost him about $1000, but he could sell it for $1800-$1900. He would use the profit to "help out" around his house. The Defendant also stated that some of the prior witnesses were confused about which guns the Defendant had at which times. The Defendant testified that he had about six or seven guns.

The Defendant further testified that, after shooting the two, he pulled Hoffman's body out of the car and got in. He arrived at the church where he planned on running into the woods, but he instead decided to push Nance's body down a hill. Around that time, a number of phone calls were made from Nance's phone to the Defendant's mother's phone, but the Defendant did not recall making any of those calls. He then arrived at Byrge's house, were he came up with the story of the car accident. The Defendant then stated that he did not call Po-Boy's Tires while at Byrge's house. The Defendant did admit calling Walden, and he stated that he was smoking one of his own "blunts" when Walden arrived.

The Defendant testified that Walden then followed him to a location on Tipton Station Road, which the Defendant knew well. Walden gave him a rag from his Jeep, and the Defendant put the rag into the gas tank of the Buick. He lit the rag and ran back to the Jeep, where his friends were waiting. The Defendant took Walden's phone and called Byrge and the Defendant's mother. Walden then took him to the Knight's Inn, where his stepmother met them. The Defendant was there with his girlfriend, Shalena Wells, when he took off his shoes and put on a pair given to him by Walden. Later, the Defendant's mother, grandmother, and his mother's boyfriend drove up to the Knight's Inn. The Defendant jumped into the car, and he was then arrested. The Defendant claimed he threw Nance's gun out the window as he was going across a bridge. On re-direct examination, the Defendant stated that he flushed the cocaine down the toilet, and he gave some of the money to Walden and threw some of it away.

After the Defendant testified, the State determined it would withdraw its objection to Dr. Auble testifying as an expert. Dr. Pam Auble then testified that she met with the Defendant at the request of defense counsel. She performed a number of tests on the Defendant, including the Wechsler Adult Intelligence Scale test, an IQ test, on which the Defendant scored a 78. This score put the Defendant in the "borderline range of functioning." Dr. Auble also examined the

Defendant's memory, attention, ability to go from one idea to another, and his ability to use language. She noted that the Defendant had difficulties with attention and concentration, his spelling, reading, and math skills were poor, but he was "pretty good" at putting puzzles together. Dr. Auble also performed personality tests on the Defendant, which showed the Defendant was very depressed, viewed himself in a bleak way, and had trouble controlling emotions. The Defendant tended to respond first, and think second. These determinations were made during interviews with the Defendant that occurred over ten hours.

Dr. Auble further testified that she reviewed the Defendant's previous medical and psychological records, and she determined that the Defendant had a chaotic life as a child, never feeling safe and not trusting anyone. The Defendant had poor eye contact during the interviews, and Dr. Auble tested the Defendant for malingering, but he showed no sign of malingering. The Defendant's records also showed he had been molested by one of his mother's boyfriends when he was twelve years old. Specifically addressing events that led up to Memorial Day, 2003, Dr. Auble stated that the Defendant was expelled from school after an altercation, he impregnated his girlfriend, he was in a car accident, and possibly made a suicide attempt. Then, in April 2003 the Defendant was robbed, which made him even more distrustful and paranoid. Dr. Auble diagnosed the Defendant as having major depression, attention deficit hyperactivity disorder, oppositional defiant disorder, and low intellectual functioning. Additionally, there were a number of psychosocial stresses from his life experiences. In response to questioning about how the Defendant would have reacted to perceived threats, Dr. Auble further testified that the Defendant would be quick to perceive people as hostile. He would respond impulsively, without thinking, and this all would have affected his mental state at the time of the killings.

On cross-examination, Dr. Auble testified that her analysis relied on the Defendant's telling her the truth. She stated that the Defendant described the incident to her, stating that he felt these two people were threatening him, and they were going to hurt him. He reacted by shooting them. Dr. Auble then admitted that the Defendant told her he shot Hoffman first, after she pulled a gun on him. Dr. Auble admitted that if that was inaccurate, that could potentially alter her analysis. Dr. Auble also stated that the Defendant told her he was heavily into drugs and alcohol during the time leading up to the shootings, and this would not necessarily be inconsistent with him selling drugs on the street. Dr. Auble admitted that the Defendant had previously lied to her about his substance abuse. On re-direct examination, Dr. Auble stated that the only inconsistent statement from the Defendant was who pulled the gun on him.

Based on this evidence, the jury convicted the Defendant of two counts of first-degree premeditated murder, one count of especially aggravated robbery, and one count of setting fire to personal property. The jury found the Defendant not guilty of the two counts of felony murder.

At the sentencing hearing, the trial court noted there would be no need to address the sentence for the two first-degree murder convictions as the sentence would be set by statute. Kevin Hoffman, the father of Oshlique Hoffman, then testified that Hoffman was a fun, happy girl who had "never really been in trouble." She was a good mother who always brought her baby to see him.

Kevin Hoffman stated that he missed his daughter, and she did not deserve what happened. He believed that the Defendant should serve consecutive sentences.

Jackie Hines, Oshalique Hoffman's maternal aunt, testified that she was now raising Hoffman's daughter. Her daughter cries for her mother, and she does not understand why her mother is not there and not coming back. Hoffman's daughter frequently looks up to the sky and says "hi" to her mother, and she says she misses her. Hines stated that the killings caused her to have a mini-stroke because she could not stand the stress. She felt the Defendant was a dangerous person who should receive consecutive sentences.

The Defendant then testified, stating he understood why the families of the victims would want him dead. However, the people involved in the trial did not understand the struggle he went through. He stated he was willing to spend the rest of his life in prison, but he was sorry, and he hoped he would be forgiven. On cross-examination, the Defendant refused to respond to questioning on whether he committed the crimes. He stated he was wrongly convicted of first-degree murder.

The State argued the Defendant's sentence should be enhanced based on his previous history of criminal convictions or behavior, the personal injuries inflicted or the amount of damage was particularly great, the offense involved more than one victim, there was a previous history of unwillingness to comply with conditions of a sentence involving release in the community, a firearm was used, there was no hesitation about committing a crime when the risk to human life was high, and the victims were treated with exceptional cruelty. The Defendant argued in mitigation that there was strong provocation, the Defendant lacked substantial judgment in committing the offenses, and the Defendant was suffering from a mental condition that significantly reduced his culpability for the offense.

Addressing the enhancement factors only applicable to the especially aggravated robbery and setting fire to personal property, the court found that the Defendant had a previous history of criminal convictions or behavior and that the personal injuries inflicted were great. Additionally, the court found the Defendant had a history of unsuccessful community sentences, he used a firearm, and he had no hesitation about committing the offenses. The court rejected the mitigating factor of strong provocation, but it gave some weight to a lack of judgment due to youth. As a result, the Defendant was given life sentences for the two first-degree murder convictions, twenty years for the especially aggravated robbery conviction, and three years for the arson conviction.[1] Finding the Defendant was a dangerous offender, the trial court determined that all four sentences should be served consecutively.

## II. Analysis
## A. Sufficiency of the Evidence

---

[1]Because the Defendant was convicted of setting fire to personal property, a Class E felony, not arson, a Class D felony, the three year sentence for arson was later amended to two years for setting fire to personal property.

The Defendant's first two allegations of error are that there was insufficient evidence to convict the Defendant of either count of first-degree murder or especially aggravated robbery. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass,13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. First-Degree Murder

First-degree murder is statutorily defined as, among other things, "A premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). Premeditation is defined as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been

formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d) (2006).

Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done "after the exercise of reflection and judgment" as required by Tennessee Code Annotated section 39-13-202(d). State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (citing State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003)). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). The Tennessee Supreme Court has previously identified the following circumstances as supporting a finding of premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. See id. (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn.1997)). However, these factors are not exhaustive. Davidson, 121 S.W.3d at 615. Establishment of a motive for the killing is a factor from which the jury may infer premeditation. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

Viewed in a light most favorable to the State, the evidence is sufficient to sustain the Defendant's convictions of first-degree premeditated murder. The proof at trial showed that the Defendant called the victim, Nance, to set up a meeting. The Defendant owed Nance money for crack cocaine fronted to him by Nance. The Defendant took his gun with him, got into the car with the two victims, and shot them both. The Defendant pushed the driver out of the car and drove off with one of the victims still in the passenger seat. There was testimony that the Defendant appeared to be changing the music as he drove away from the crime scene, and he nodded to a witness as he drove by. The Defendant pushed or dragged the other victim, Nance, down a hill behind a church in an attempt to hide his body. He then went to an ex-girlfriend's house where he cleaned out the car and attempted to call Po-Boys Tires, a buyer of rims. Finding they were closed for Memorial Day, the Defendant called his cousin, who followed the Defendant to dispose of the car by burning it. The Defendant had his step-mother check into a motel where he disposed of money and drugs, and smoked a marijuana cigarette. When the Defendant attempted to leave the motel room, he was arrested.

From this evidence, a rational jury could conclude that the admittedly intentional killing was premeditated because the Defendant had a motive to kill Nance, and Hoffman happened to be with him. An additional possible motive was the theft of Hoffman's car, which appeared to have valuable rims. The Defendant called Po-Boys Tires after the killings; he did not succeed in selling the rims only because it was a holiday, and the store was closed. Additionally, a rational jury could have

concluded the Defendant attempted to destroy the evidence after the killings by burning the car. There was also evidence of the Defendant's being calm after the killings, including testimony that he appeared to be changing the radio station as he drove away. Additionally, there was testimony that the Defendant acted as if nothing was wrong in phone conversations shortly after the killings. All of these fall under the factors that a rational jury can use to infer premeditation on the part of the Defendant.

The Defendant directs our attention to the case of State v. Brandon Compton, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992 (Tenn. Crim. App., at Knoxville, Oct. 13, 2006), *perm. app. denied* (Tenn. Feb. 26, 2007). In Compton, the defendant, while armed, arrived at a residence to sell marijuana. Id. at *1. The two victims entered the residence to purchase the marijuana from the defendant, and, upon agreeing to purchase some quantity, one of the victims handed the defendant $1000. Id. The defendant inspected the money and, suspicious of it, dipped it in a bowl of water to check to see if it was counterfeit: it was. Id. The defendant remained calm and explained to the victims that they had apparently given him some counterfeit money. Id. When he asked for his marijuana to be returned, the victims refused and proceeded towards the door. Id. The defendant followed the victims down a short hallway before he shot both of them, twice each, in the back. Id. He stated, "That's what you get for stealing my weed." Id. The defendant then left the residence and disposed of the gun before he was arrested. Id. at *5.

The jury in Compton determined the defendant acted with premeditation based on his use of a deadly weapon upon the unarmed victims, his attempts to dispose of evidence, and the fact that the defendant was calm after the killings. Id. We concluded that there was insufficient evidence to support a finding of premeditation because the defendant was not "free from excitement and passion," due to his property being stolen. Id. (citing T.C.A. § 39-13-202(d) (2003)). We recognized that "[t]he shooting proceeded to a conclusion without any intervening or dispassionate reflection." Id.

Turning to the present case, if the Defendant's version of the events was the only possible version, we might conclude that the Defendant had a strong and potentially persuasive argument. However, unlike Compton, where all the testimony coincided as to the course of events, there are at least two possible versions of why the killings occurred in this case. The State argues that the Defendant premeditated the murders of Nance and Hoffman in order to rob them, with the additional benefit of extinguishing a drug debt. A rational jury is entitled to review the evidence and accept the State's theory. Again, the weight and value to be given to the evidence, and the credibility to be given to witnesses is left to the jury. Liakas, 286 S.W.2d at 859. We are required to afford the State the strongest legitimate view of the evidence contained in the record. The evidence is sufficient to sustain the Defendant's convictions. Therefore, the Defendant is not entitled to relief on this issue.

## 2. Especially Aggravated Robbery

The Defendant next contends there was insufficient evidence to convict him of especially

aggravated robbery. Especially aggravated robbery is "robbery as defined in § 39-13-401: (1) Accomplished with a deadly weapon; and (2) Where the victim suffers serious bodily injury." T.C.A. § 39-13-403 (2006). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (2006). Theft is committed when "with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2006).

In first addressing whether there was sufficient evidence for an "intentional and knowing theft," the jury heard testimony that Hoffman owned the car and that the Defendant took it and exercised control over it. The jury could have based its determination that the Defendant intended to deprive Hoffman of the car simply from the nature of the facts: the Defendant shot Hoffman, pushed her out of the car, drove off, attempted to sell her rims, and then burned the car. See State v. Stacy Johnson, No. W2004-00464-CCA-R3-CD, 2005 WL 645165, at *10 (Tenn. Crim. App, at Jackson, March 15, 2005) (concluding sufficient evidence for theft of automobile), *perm. app. denied* (Tenn. Aug. 29, 2005); see also T.C.A. § 39-11-106(a)(8) (2006) (defining "deprive" in part as "[w]ithhold[ing] property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner; . . . or [d]ispos[ing] of property or use it or transfer any interest in it under circumstances that make its restoration unlikely"). There is likewise sufficient evidence that this was accomplished by violence, as there was clear evidence that Hoffman was killed immediately before the taking of the car. See State v. Owens, 20 S.W.3d 634, 637 (Tenn. 2000) ("The act of violence or of putting a person in fear must precede or be concomitant to or contemporaneous with the taking of property to constitute robbery . . . ."). Finally, the jury heard testimony that the Defendant shot Hoffman with his gun and killed her. This is sufficient evidence to sustain the Defendant's conviction for especially aggravated robbery. Thus, the Defendant is not entitled to relief on this issue.

### B. Expert Testimony and the Fifth Amendment

The Defendant's next allegation of error is that the trial court erred by initially not allowing Dr. Pam Auble to testify. The Defendant asserts that this error forced the Defendant to take the stand in his own defense, a violation of the Fifth Amendment. The State responds that the trial court did not abuse its discretion when it prohibited Dr. Auble from initially testifying, and, if it did, such error was harmless because Dr. Auble did subsequently testify. Additionally, the State argues that the Defendant has not supported his allegation that his testimony violated the Fifth Amendment.

We begin our examination of this issue by determining if it was error to initially prevent Dr. Auble from testifying. "Determinations of the admissibility of expert testimony are within the sound discretion of the trial court." State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2002). We review the trial court's determination for an abuse of discretion. Id. In the argument over whether Dr. Auble would be permitted to testify, the Defendant stated that Dr. Auble would offer her opinion that, due to the Defendant's mental illnesses, he would have been unable to premeditate at the time of the killings. The State alleged that this was proof of "diminished capacity," irrelevant, and invasive of the

province of the jury. The trial court ultimately rested its decision on the fact that the testimony was "invasive and not allowable."

The Tennessee Supreme Court has recently reiterated in State v. Faulkner, 154 S.W.3d 48, 56-57 (Tenn. 2005), that certain proof of this type may be allowable if it conforms to the requirements of State v. Hall, 958 S.W.2d 679, 688-90 (Tenn. 1999). We observe that the Court in Faulkner stated:

> In Hall, the Court held that if general relevancy standards and evidentiary rules are satisfied, "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." The Court cautioned against referring to such evidence as proof of "diminished capacity." Instead, such evidence should be presented as relevant to negate the existence of the culpable mental state. The Court distinguished "mental disease or defect" from "emotional state or mental condition":
>
>> [W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

Faulkner, 154 S.W.3d at 56-57 (citing and quoting Hall, 958 S.W.2d at 689-90) (citations omitted).

Tennessee Rule of Evidence 702 allows expert testimony if it "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Tennessee Rule of Evidence 704 goes on to state, "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." We note the advisory comment does not apply because there was no allegation of insanity. See Tenn. R. Evid. 704, Adv. Comm'n Cmts ("One ultimate issue is outside the scope of expert testimony. T.C.A. § 39-11-501 provides that 'no expert witness may testify as to whether the defendant was or was not insane.'"). Dr. Auble planned to opine that, due to the Defendant's mental diseases or defects, he could not have premeditated the shooting. We observe that, at a minimum, major depression constitutes a "mental disease or defect." See State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Because Dr. Auble would have testified that the Defendant suffered from major depression her testimony was improperly excluded.

Subsequent to this decision, however, the Defendant testified on his own behalf, and then the State withdrew its objection to Dr. Auble's testimony. She went on to fully testify about the Defendant's mental issues and their effect on his ability to premeditate. Thus, the State argues this

is harmless error on the part of the trial court. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). The test for harmless error is, "considering the whole record, [did the] error involving a substantial right more probably than not affect[] the judgment or [] result in prejudice to the judicial process." Tenn. R. App. P. 36(b). We conclude that the error was harmless because Dr. Auble was eventually allowed to testify. The Defendant has alleged that the initial prohibition on Dr. Auble testifying required him to testify against his wishes. However, we find nothing in the record to indicate that the Defendant ever expressed reservation about testifying, or that he testified only because Dr. Auble's proposed testimony had initially been excluded. This issue was never raised in the trial court, see Tenn. R. App. P. 36(a), but, even if it had been, the Defendant has not cited any authority for the proposition that relief can be granted on Fifth Amendment grounds when a Defendant felt "forced" to testify because an expert was excluded. Thus, we conclude the Defendant is not entitled to relief on this issue.

### C. Sentencing

The Defendant next challenges the propriety of his sentence. Although the Defendant does not contest his life sentences for the two murder convictions, he does contest the enhancement factors applied to the sentences for especially aggravated robbery and setting fire to personal property. Additionally, he alleges the trial court improperly refused to mitigate his sentence, and the trial court improperly ran his sentences consecutively. For the reasons stated below, we modify the especially aggravated robbery and setting fire to personal property sentences. We affirm the consecutive sentencing for all four of the Defendant's convictions.

When a defendant challenges the length, range or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, T.C.A. § 40-35-103 (2006), we may not disturb the sentence even if a different result was preferred. State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

We initially note that the trial court failed to specifically state which enhancing factors applied to which crimes, leading this Court to conclude that all the enhancement factors were applied to both especially aggravated robbery and setting fire to personal property. The trial court found the following enhancement factors applied: (1) "the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;"

(2) "the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great"; (3) "the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into a community"; (4) "the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense"; and (5) "the defendant had no hesitation about committing a crime when the risk to human life was high." T.C.A. § 40-35-114(1), (6), (9), (10), (11) (2003).

First addressing the especially aggravated robbery conviction, we agree with the State that the trial court erred in enhancing the Defendant's sentence based on acts he committed while he was a juvenile. See State v. Jackson, 60 S.W.3d 738, 742 (Tenn. 2001). Because the Defendant was sixteen at the time of the killings, all his previous acts were committed while he was a juvenile. However, the State argues that the Defendant's sentence could be enhanced for acts committed as a juvenile which would have been a felony had the Defendant been an adult, to wit, theft of a vehicle. However, because there is no evidence that the value of the vehicle was more than $500, we cannot agree with the State that this constituted a felony had the Defendant been an adult. See T.C.A. § 39-14-105 (2006).

The State next concedes error in enhancement based on the fact that there were great personal injuries inflicted upon the victim. We agree with the State. Because the Defendant was convicted of especially aggravated robbery, and serious bodily injury is inherent in the crime, the Defendant's sentence cannot be enhanced based on this factor. See T.C.A. § 39-13-403 (2006); State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994); State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995).

The State next concedes error in the application of the use of a firearm enhancement factor. We also agree with this allegation of error. The use of a deadly weapon is inherent in the crime of especially aggravated robbery. See T.C.A. § 39-13-403(a); Nix, 922 S.W. at 903.

With respect to the conviction for setting fire to personal property, the State's concession of error, mentioned above, concerning the Defendant's juvenile record, also applies here. The trial court's consideration of the Defendant's juvenile conduct was error in this case.

The State next concedes error in enhancing the Defendant's sentence based on his use of a firearm in setting fire to Hoffman's car. We agree that there is no evidence that the Defendant used a firearm in the commission of this crime. In fact, there was substantial evidence that the Defendant dropped his gun when he removed Hoffman from her car. His gun was found beside Hoffman, and it was likely in police possession by the time the car was set fire.

Because of the errors in sentencing, we will review the sentence de novo, and re-sentence the Defendant appropriately. In conducting a de novo review of a sentence, we must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing, (4) the arguments of counsel relative to sentencing alternatives, (5) the nature and characteristics of the offence, (6) any mitigating or enhancement factors, (7) any statements made by the defendant on his or her own behalf and (8) the defendant's potential or lack of potential for

rehabilitation or treatment.  See Tenn. Code Ann. § 40-35-210 (2006); State v. Taylor, 63 S.W.2d 400, 411 (Tenn. Crim. App. 2001).

We recognize that this task has somewhat changed with the recent decision of the United States Supreme Court in Cunningham v. California, 549 U.S. —, 127 S. Ct. 856 (2007).  The Supreme Court in Cunningham determined that California's sentencing scheme was unconstitutional because a defendant's sentence could be enhanced based on facts found by a judge by a mere preponderance of the evidence.  Id. at 868.  This Court, in State v. Mark A. Schiefelbein, concluded that Cunningham cast doubt on Tennessee's sentencing scheme under the 1989 Sentencing Act. Nos. M2005-00166-CCA-R3-CD, M2005-02370-CCA-R10-CO, 2007 WL 465151, at *41-52 (Tenn. Crim. App., at Nashville, Feb. 8, 2007).  However, relying on State v. Gomez, 163 S.W.3d 632 (Tenn. 2005), which held that Tennessee's 1989 Sentencing Act was constitutionally viable, we refused to grant relief on that issue.  Schiefelbein, 2007 WL 465151, at *48-49.  Gomez was subsequently vacated and remanded for reconsideration in light of Cunningham by the United States Supreme Court.  Gomez v. Tennessee, — U.S. —, 127 S. Ct. 1209 (2007).  Upon a petition for rehearing in Schiefelbein, we concluded that "Cunningham did apply the *coup de grace* to the rationale employed in Tennessee's pre-2005 sentencing law."  State v. Mark A. Schiefelbein, No. M2005-00166-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 213, at *2-3 (Tenn. Crim. App., at Nashville, Mar. 7, 2007).  Further, we held "that the trial court's use of statutory enhancement factors to increase the length of each of the petitioner's sentences to the statutory maximum in the range violated his Sixth Amendment right to a trial by jury."  Id. at *3.

Thus, we conclude that the Defendant should receive the minimum sentence of one year for his conviction for setting fire to personal property, a Class E felony.  See T.C.A. §§ 39-14-303(b), 40-35-112(a)(5) (2003).  As to the conviction for especially aggravated robbery, a Class A felony with a range of fifteen to twenty-five years with a presumptive mid-range sentence of twenty years, we conclude the Defendant should receive eighteen years.  See T.C.A. §§ 39-13-403(b), 40-35-112(a)(1) (2003).  The presumptive minimum sentence would be twenty years, and we mitigate the sentence based on the Defendant's age and lack of judgment, as the trial court did.  See T.C.A. §§ 40-35-113(6), 40-35-210(c) (2003); State v. Steven Nelorn Hampton, Jr., No. M2004-00704-CCA-R3-CD, 2005 WL 677279, at *8 (Tenn. Crim. App., at Nashville, Mar. 24, 2005) (concluding Blakely did not require the imposition of the minimum sentence in the range for a Class A felony), *perm. app. denied* (Tenn. Oct. 10, 2005).

The Defendant also challenges the imposition of consecutive sentences.  In order for a court to find a Defendant should serve his sentences consecutively based on his classification as a dangerous offender, see T.C.A. § 40-35-115(b)(4) (2003), four Wilkerson factors must be satisfied: (1) the Defendant's behavior indicated little or no regard for human life; (2) he did not hesitate to act when the risk to human life was high; (3) extended confinement is necessary to protect society; and (4) the total length of the sentence must reasonably relate to the conviction offenses.  State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002); State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

We find little trouble in concluding that the Defendant acted with little or no regard for

human life, and he clearly did not hesitate to act when the risk to human life was high.  The bare facts of the case make that abundantly clear.  We additionally conclude that consecutive sentencing is necessary to protect society from this Defendant.  Finally, we determine that this extensive sentence is reasonably related to the Defendant's acts of shooting and killing two individuals, stealing the car, and burning it after dumping the victims' bodies.

Accordingly, the Defendant should receive two sentences of life with the possibility of parole for the murders of the two victims, eighteen years for especially aggravated robbery, and one year for setting fire to personal property.  These sentences are to be run consecutively.

### III.  Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the Defendant's convictions, and we modify the Defendant's sentences as indicated.  We remand the case for entry of judgments and further proceedings not inconsistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE